# Illinois Official Reports

## Appellate Court

---

**Bagwell v. Illinois Workers' Compensation Comm'n, 2017 IL App (4th) 160407WC**

---

| | |
|---|---|
| Appellate Court Caption | DARRELL BAGWELL, Appellant, v. THE ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Nestle USA, Inc., Appellee). |
| District & No. | Fourth District, Workers' Compensation Commission Division<br>Docket Nos. 4-16-0407WC, 4-16-0408WC cons. |
| Filed | September 8, 2017 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 15-MR-401; the Hon. Paul G. Lawrence, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Steven R. Williams, of Williams & Swee, Ltd., of Bloomington, for appellant.<br><br>Shawn R. Biery, of Keefe, Campbell, Biery & Associates, of Chicago, for appellee. |
| Panel | PRESIDING JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.<br>Justices Hoffman, Hudson, Harris, and Moore concurred in the judgment and opinion. |

¶ 1    The claimant, Darrell Bagwell, filed applications for adjustment of claims under the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2008)), seeking benefits for injuries he sustained on June 2, 2008, and March 23, 2009, while performing his job duties for Nestle USA, Inc. (employer). The claims were consolidated for arbitration. Following a hearing, the arbitrator found that the claimant had sustained work-related accidents on June 2, 2008, and March 23, 2009, and that the claimant's current conditions of ill-being were causally related to those work accidents. The arbitrator awarded the claimant temporary total disability (TTD) benefits, temporary partial disability (TPD) benefits, and medical expenses but declined the claimant's claims for penalties and attorney fees.

¶ 2    The arbitrator also awarded the claimant wage differential benefits under section 8(d)(1) of the Act (820 ILCS 305/8(d)(1) (West 2008)) but rejected the claimant's argument as to how such benefits should be calculated. While he was working for the employer, the claimant also served as the pastor of a church. At the time of the claimant's work accidents, the employer was aware that the claimant served as a pastor. Relying upon section 10 of the Act (820 ILCS 305/10 (West 2008)), the claimant argued that his salary as a pastor should be included in calculating his average weekly wage for purposes of determining his entitlement to wage differential benefits. The arbitrator rejected this argument. The arbitrator found that, although it was undisputed that the employer was aware that the claimant served as a pastor, the claimant had failed to prove that the employer knew he was being compensated for that position at the time of the accidents. Accordingly, for purposes of wage differential benefits, the arbitrator calculated the claimant's average weekly wage based solely upon what the claimant would have earned from his employment with the employer, without including his earnings as a pastor.

¶ 3    The claimant appealed the arbitrator's decision to the Illinois Workers' Compensation Commission (Commission). The Commission vacated the arbitrator's award of medical expenses but otherwise affirmed and adopted the arbitrator's decision. Regarding the arbitrator's average weekly wage calculation pursuant to section 10 of the Act, the Commission found that the arbitrator had "properly excluded concurrent employment income from the *** calculation because while certain employees of the employer did know of [the claimant's] religious activities, there was no credible proof that the employer knew during the relevant pre-accident period that the claimant's activities actually constituted gainful employment, rather than volunteering or similar community activities."

¶ 4    The claimant then sought judicial review of the Commission's decision before the circuit court of McLean County, which affirmed the Commission's decision.

¶ 5    This appeal followed.

## BACKGROUND

¶ 7    The claimant worked in the employer's candy factory for 27 years. On June 2, 2008, the claimant injured his back at work while lifting a box of taffy from the floor. An MRI revealed a disc herniation at L4-L5. On September 2, 2008, the claimant had surgery to repair the disc. Thereafter, the claimant continued to experience low back pain and back and leg pain associated with the L5 nerve root.

¶ 8      On March 23, 20009, shortly after the claimant returned to work, he reinjured his lower back while lifting and pushing heavy trays of candy down an assembly line. He was diagnosed with a recurrent herniation at L4-L5 and underwent another back surgery on April 15, 2009. His symptoms continued to worsen after the second surgery. In February of 2010, Dr. Keith Kattner, the claimant's neurosurgeon, diagnosed him with battered nerve syndrome and recurrent disc herniation and opined that the claimant was limited to a sedentary lifestyle and was no longer employable in his prior factory position. Dr. Kattner also opined that the claimant's 2008 work accident was causally related to his current conditions of ill-being and his need for lower back surgery.

¶ 9      While he was working for the employer, the claimant also served as the pastor of the Mt. Zion Missionary Baptist Church in Galesburg, Illinois (Mt. Zion). During the arbitration hearing, the claimant testified that he had been Mt. Zion's pastor for 16 years. He was serving as Mt. Zion's pastor at the time of the work accidents at issue, and he was still working in that capacity at the time of arbitration. Mt. Zion had 100 to 150 congregants. The claimant worked in the church on Sundays from 9:45 a.m. to 2:00 p.m., and he conducted Bible study at the church on Wednesday evenings from 7:00 p.m. to 8:00 p.m. The church paid the claimant $600 per week as a housing allowance.

¶ 10      The claimant testified that the employer was aware that he was a pastor while he was working for the employer. He noted that Andy Darling, a plant manager for the employer, came to Mt. Zion to hear the claimant preach and that other members of management knew he was a minister (including Jerry Holly, who was a pastor himself). Moreover, several other members of the employer's management had attended weddings or funerals that the claimant had officiated, including Chris Wattland, the employer's human resources manager, and two of the employer's former company nurses. The claimant further testified that he officiated a wedding at the plant on one occasion in 2005 or 2006 and that, on several occasions, the employer had asked the claimant to say the Thanksgiving prayer or to pray for individuals who "were in a catastrophe." In addition, prior to his first work accident, the claimant had filed a religious discrimination charge against the employer with the Illinois Department of Human Rights (IDHR) and the Equal Employment Opportunity Commission (EEOC), which put the employer on notice that the claimant worked as a minister at a church where he performed services twice per week.[1]

¶ 11      However, the claimant testified that the employer was not aware that Mt. Zion paid the claimant for his services as pastor. When asked by his attorney whether his supervisors and employers at the employer knew that he was being paid for his job as a minister, the claimant responded:

> "No, they didn't know I was being paid, because my religious position had nothing to do with [the employer]. After I put in my eight hours at [the employer] that was all I owed to them. I didn't owe them what else I was doing in my life. So, no, they didn't know how much money I was making."

---

[1]The claimant filed the IDHR and EEOC complaints after the employer had denied his request for a religious accommodation. The claimant had asked the employer to accommodate his religious beliefs by allowing him to withdraw his bid for the Laffy Taffy cook position and return to a first-shift position so that he would be free to teach Bible study at his church on Wednesday evenings. The parties ultimately settled the claim.

The claimant confirmed this testimony on cross-examination during the following colloquy with the employer's counsel:

"Q. In response to a question from your attorney today, you indicated that [the employer] wouldn't have known what you were paid through the ministry because it was none of their business essentially or it was personal?

A. Yes, sir, because that was a side job, that wasn't [the employer's] concern, what I made.

Q. Okay. I just wanted to make sure I heard that correctly.

A. Yes, yes, sir."

¶ 12    Dennis Gustafson, a certified vocational rehabilitation counselor, testified on the claimant's behalf by way of evidence deposition. Gustafson testified that the claimant had performed heavy, unskilled work for the employer and that, due to his current medical condition, the claimant was no longer able to perform such work. He noted that the claimant had some basic capabilities that would enable him to perform clerical work at an entry level. However, Gustafson opined that the claimant did not have any transferrable skills to sedentary work. Gustafson further opined that the claimant's likelihood of securing clerical work within his work restrictions was "poor" because (1) the claimant would need to sit or stand for long periods in a clerical job, which was difficult for him, (2) the claimant had no prior clerical work experience, (3) an employer would be more likely to hire someone 25 years old or younger who is starting out his or her career rather than a 57-year-old who has medical problems, and (4) there is a lot of competition for clerical jobs. Gustafson testified that, if the claimant were to secure employment, Gustafson estimated that the claimant's compensation would be between $9 and $10 per hour.

¶ 13    Daniel Minnich, a certified vocational rehabilitation counselor, testified on the employer's behalf by way of an evidence deposition. Minnich opined that the claimant was limited to sedentary work. As a result, Minnich concluded that the claimant was unable to perform many of the jobs he had previously held with the employer, and he was unable to perform the duties of a full-time clergy member (which required a higher level of physical exertion). Minnich estimated that entry-level positions for religious education would pay $9.49 per hour.

¶ 14    The parties each introduced a wage statement prepared by the employer, which indicated that, at the time of the June 2, 2008, work accident, the claimant's average weekly wage from the employer was $636.94. The parties stipulated that, pursuant to the collective bargaining agreement executed by the employer and the claimant's union, if the claimant were still working for the employer in the same position at the time of arbitration, his average weekly wage from the employer would have been $815.20.

¶ 15    The claimant also introduced a salary statement from Mt. Zion, which indicated that Mt. Zion had paid the claimant $600 per week from January 2010 through October 2013. Kim Mitchell, Mt. Zion's financial secretary, authenticated this document and testified that Mt. Zion had been paying the claimant $600 per week from June 2007 through the time of arbitration. The claimant also testified that he was earning $600 per week from Mt. Zion and that he had been earning that same amount since the year before his work accident.

¶ 16    The arbitrator found that the claimant had sustained work-related accidents on June 2, 2008, and March 23, 2009, and that the claimant's current conditions of ill-being were

causally related to those work accidents. The arbitrator awarded the claimant TTD benefits, TPD benefits, and medical expenses but declined the claimant's claims for penalties and attorney fees.

¶ 17    The arbitrator also awarded the claimant wage differential benefits under section 8(d)(1) of the Act. The arbitrator acknowledged that, "[w]hen a claimant is currently employed, all earnings must be considered when calculating [the claimant's] wages pursuant to section 10 of the Act." However, the arbitrator noted that wages the claimant earned from a second employer are included in this calculation only if such wages were "known by the first employer at the time of the accident." The arbitrator found that, in this case, the employer was aware at the time of the work accidents that the claimant was a pastor. However, after reviewing the relevant evidence, the arbitrator found that "there [did] not appear to be adequate proof that the [employer] was aware [that the claimant] was being compensated for a second job" at the time of the work accidents. In support of this conclusion, the arbitrator noted that the documentary evidence submitted by the claimant (including the claimant's written request for a religious accommodation and the discrimination charge he filed against the employer) did not indicate that the claimant was "seeking time off for a paying job." Moreover, the arbitrator noted that the claimant himself had testified that the wages he earned as a pastor were "none of [the employer's] business." Further, the arbitrator observed that, although the employer had subpoenaed Mt. Zion's tax and wage records, those records were never provided.[2]

¶ 18    For all these reasons, the arbitrator denied the claimant's claim for concurrent wages, *i.e.*, she declined to include the wages the claimant had earned as a pastor in his average weekly wage for purposes of determining the claimant's wage differential benefit. Based on the evidence presented by the parties (including the parties' stipulation that the claimant would be earning $815.20 per week if he still worked for the employer and the fact that the claimant was currently earning $600 per week as a pastor), the arbitrator found that the claimant was entitled to a wage differential benefit "representing two-thirds of the $215.20 difference in his current position as a pastor and what he could be earning at [the employer], or $143.47 per week, for the duration of his disability, commencing January 14, 2013."

¶ 19    The claimant appealed the arbitrator's decision to the Commission. The Commission vacated the arbitrator's award for medical expenses but otherwise unanimously affirmed and adopted the arbitrator's decision. The Commission found that the arbitrator had "properly excluded concurrent employment income from the Average Weekly Wage calculation" under section 10 of the Act "because while certain employees of the employer did know of [the claimant's] religious activities, there was no credible proof that the employer knew during the relevant pre-accident period that the claimant's activities actually constituted gainful employment, rather than volunteering or similar community activities."

¶ 20    The claimant then sought judicial review of the Commission's decision before the circuit court of McLean County, which affirmed the Commission's decision.

¶ 21    This appeal followed.

---

[2]The arbitrator noted that the claimant testified that he did not provide these records to the employer on the advice of another attorney who was not his workers' compensation attorney.

ANALYSIS

On appeal, the claimant argues that the Commission's determination of his average weekly wage was against the manifest weight of the evidence. Specifically, the claimant argues that the Commission erred by excluding his earnings as a pastor from the average weekly wage calculation for purposes of determining his wage differential benefit, in violation of section 10 of the Act.

The claimant has the burden of proving, by a preponderance of the evidence, the elements of his claim, including his average weekly wage. *Sylvester v. Industrial Comm'n*, 314 Ill. App. 3d 1100, 1103 (2000); *Zanger v. Industrial Comm'n*, 306 Ill. App. 3d 887, 890 (1999). The Commission's determination of claimant's average weekly wage is a question of fact that a reviewing court will not disturb unless it is contrary to the manifest weight of the evidence. *Sylvester*, 314 Ill. App. 3d at 1103. For a finding of fact to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent. *United Airlines, Inc. v. Illinois Workers' Compensation Comm'n*, 382 Ill. App. 3d 437, 440 (2008).

The basis for computing a claimant's average weekly earnings is governed by section 10 of the Act (820 ILCS 305/10 (West 2008)). Section 10 defines the employee's average weekly wage as

> "the actual earnings of the employee in the employment in which he was working at the time of the injury during the period of 52 weeks ending with the last day of the employee's last full pay period immediately preceding the date of injury, illness or disablement excluding overtime, and bonus divided by 52[.] *** When the employee is working concurrently with two or more employers *and the respondent employer has knowledge of such employment* prior to the injury, his wages from all such employers shall be considered as if earned from the employer liable for compensation." (Emphasis added.) 820 ILCS 305/10 (West 2008).

The dispositive question in this case is whether the employer had knowledge of the claimant's "employment" as a pastor prior to the work accidents at issue, thereby triggering section 10's concurrent wage calculation requirement.

The Act does not define "employment." According to Oxford's online English Dictionary, "employment" means "[t]he state of having *paid work*," or, "[a] person's trade or profession." (Emphasis added.) English Oxford Living Dictionaries, https://en.oxforddictionaries.com/ definition/employment (last visited Sept. 7, 2017). Other dictionaries define employment in a similar manner. See, *e.g.*, Dictionary.com, http://www.dictionary.com/browse/employment (last visited Sept. 7, 2017) (defining "employment" as "an occupation by which a person earns a living; work; business"). Although the Act does not define "employment," it implicitly adopts this understanding of employment as paid work in other, related definitions. For example, the Act defines an "employee" as "[e]very person in the service of another under any contract *of hire*." (Emphasis added.) 820 ILCS 305/1(b)(2) (West 2008). To "hire" is to "engage the services of (a person or persons) *for wages or other payment*." (Emphasis added.) Dictionary.com, www.dictionary.com/browse/hire (last visited Sept. 7, 2017); see also Merriam-Webster, https://www.merriam-webster.com/dictionary/hire (last visited Sept. 7, 2017) (defining "hire" as "payment for labor or personal services"). We therefore hold that the common, ordinary meaning of the term "employment" as used in section 10 of the Act encompasses the concept of payment for work or services rendered.

¶ 28    Accordingly, in this case, the wages the claimant earned as a pastor must be included as wages earned from the employer pursuant to section 10 only if the employer knew that the claimant received payment for his work as a pastor. 820 ILCS 305/10 (West 2008)). The Commission found that the clamant failed to prove that the employer had such knowledge. We cannot say that this finding was against the manifest weight of the evidence. Although the employer admitted that it knew the claimant served as a pastor during the relevant period, the claimant presented no evidence suggesting that the employer knew that he was compensated for that service. To the contrary, when asked during direct examination whether his supervisors and employers knew that he was being paid for his job as a minister, the claimant responded, "[n]o, they didn't know I was being paid." He confirmed this testimony on cross-examination, when he agreed that the employer would not have known what he was paid through the ministry because it was "none of their business" or it was "personal." At a minimum, this testimony establishes that the claimant did not inform the employer that he was "employed" (*i.e.*, paid) by Mt. Zion, that he had no reason to believe that the employer knew of such employment, and that, in fact, he believed that the employer had no such knowledge.

¶ 29    Despite having given this testimony before the arbitrator, the claimant argues on appeal that the employer "should have known" that he "worked for pay" as a pastor because (1) the employer knew that the claimant worked as a minister at a "fairly large" church where he performed services twice per week, (2) on several occasions, the employer asked the claimant to say prayers at the plant, (3) several of the employer's managers had seen the claimant preach at the church or officiate at weddings and funerals, and (4) the claimant had previously filed a claim for religious discrimination against the employer. Contrary to the claimant's argument, however, none of these facts establishes that the employer knew that the claimant was compensated for his services as a minister or pastor. When the claimant said prayers at the plant, he never asked for or received compensation for that service. Neither the claimant's request for a religious accommodation nor his IDHR and EEOC complaints against the employer mentioned that the claimant received payment from Mt. Zion. Moreover, as noted above, the claimant admitted that he never told the employer that he was paid for performing religious services. It was therefore reasonable for the employer to assume that the claimant performed those services on a volunteer basis. The claimant offered no evidence to suggest otherwise. Accordingly, the Commission's calculation of the claimant's average weekly wage was not against the manifest weight of the evidence.

¶ 30    In the alternative, the claimant argues that it is irrelevant whether the employer knew that he was paid for his religious services because section 10 merely requires the employer to have knowledge of the claimant's other "employment," not the wages he earned from such employment. We do not find this argument persuasive. As noted above, the word "employment" means "paid work" or "work for hire." Thus, the legislature clearly intended section 10's concurrent wage requirements to apply only if the employer knew that the claimant had other paid work at the time of his work injury.

¶ 31    One final point bears mentioning. The parties dispute the standard of review that should govern our analysis of this issue. The claimant argues that we should review the Commission's decision *de novo* because (1) the relevant facts are undisputed, (2) "there is no indication that the Commission drew any inferences or *** did anything other than apply the law to the undisputed facts", and (3) the question presented in this case is purely one of

statutory construction. See *Flynn v. Industrial Comm'n*, 211 Ill. 2d 546, 553 (2004); *Greaney v. Industrial Comm'n*, 358 Ill. App. 3d 1002, 1016 (2005). The employer counters that the manifest weight of the evidence standard applies because the relevant facts are disputed. We agree with the employer. The central dispute in this appeal, *i.e.*, whether the employer knew of the claimant's paid employment as a pastor prior to the work accidents at issue, is a factual dispute. Moreover, although the remaining material facts are undisputed, the dispositive question is whether those facts support a reasonable inference that the employer had such knowledge. Because different reasonable inferences could be drawn from the undisputed facts, we review the Commission's decision under the manifest weight of the evidence standard. *Gilster Mary Lee Corp. v. Industrial Comm'n*, 326 Ill. App. 3d 177, 182 (2001). However, even if we were to apply a *de novo* standard of review, the employer would still prevail.

¶ 32                                                    CONCLUSION

¶ 33        For the foregoing reasons, we affirm the judgment of the circuit court of McLean County, which confirmed the Commission's decision.

¶ 34        Affirmed.